1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JODEE GARRETT,                              No.  2:12-cv-2917 WBS KJN P

12                  Plaintiff,

13         v.                                     ORDER AND FINDINGS AND
                                                  RECOMMENDATIONS
14    J. SWEET,

15                  Defendant.

16

17    Introduction

18         Plaintiff is a state prisoner proceeding without counsel.  This civil rights action is

19    proceeding on the complaint filed December 3, 2012.  On August 8, 2013, plaintiff re-noticed his

20    motion for summary judgment; on August 30, 2013, defendant Sweet filed a motion for summary

21    judgment.  As set forth more fully below, the undersigned recommends that plaintiff's motion be

22    denied, and defendant's motion for summary judgment be granted.

23    Plaintiff's Allegations

24         In his verified[1] complaint, plaintiff alleges the following:

25    _____

26    [1]  See Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995) (a complaint or motion duly
      verified under penalty of perjury pursuant to 28 U.S.C. § 1746 may be used as an opposing
      affidavit under Fed. R. Civ. P. 56).  However, a verified complaint may function as a supporting
27    affidavit for purposes of summary judgment only to the extent that it is "based on personal
      knowledge and set[s] forth specific facts admissible in evidence."  Schroeder, 55 F.3d at 460
28    (citations omitted).

                                            1

1   On or about December 2010, while he was handcuffed, in leg irons, and being escorted on

2   a golf cart, plaintiff was assaulted and battered by inmate Valenzuela, who was sitting behind

3   plaintiff.  (ECF No. 1 at 3.)  During the assault, plaintiff claims inmate Valenzuela repeatedly said

4   to plaintiff:  "Fucking whistle blower, so you want to be a fucking whistle-blower, I hate fucking

5   whistle blowers!"  (ECF No. 1 at 6.)  Plaintiff alleges inmate Valenzuela was not handcuffed.

6   Plaintiff suffered a mandibular fracture, which required a liquid diet, and left fifth metacarpal

7   fracture, which was reduced and splinted for three months.

8   On August 20, 2011, plaintiff claims Correctional Officer McCartney told plaintiff that

9   inmate Valenzuela was not supposed to be on group escort due to his prior combative behavior

10   toward other inmates.  Plaintiff alleges that on October 11, 2011, during his first level appeal

11   interview, Sgt. J. Scogin told plaintiff that defendant Sweet had searched plaintiff's cell,

12   discovered plaintiff had sued ten fellow staff members for Eighth Amendment violations in

13   Garrett v. Walker, Case No. 2:06-cv-1904 DFL EFB (E.D. Cal.), did not like that plaintiff had

14   filed this lawsuit, and was "getting back at [plaintiff]."  (ECF No. 1 at 4.)  Plaintiff claims

15   defendant Sweet called plaintiff a "damn whistle blower that would sue every time some officer

16   did something wrong."  (ECF No. 1 at 4.)

17   Plaintiff alleges that defendant Sweet placed inmate Valenzuela behind plaintiff on the

18   golf cart and left Valenzuela's handcuffs undone so that he could attack plaintiff because plaintiff

19   had filed suit against staff members at CSP-Sacramento ("CSP-SAC") and defendant Sweet did

20   not like it.  Further, plaintiff alleges that defendant Sweet knew of Valenzuela's combative nature

21   toward other inmates, and was aware that Valenzuela was supposed to be handcuffed, shackled at

22   the ankles, and moved on a "single man escort."  (ECF No. 1 at 6.)

23   Plaintiff alleges his administrative appeal was partially granted, and the inquiry found that

24   "staff did violate CDCR [California Department of Corrections and Rehabilitation] policy."

25   (ECF No. 1 at 4, citing ECF 1 at 13.)  On February 2, 2012, Warden Virga also found that staff

26   violated CDCR policy.  (ECF No. 1 at 19.)  Plaintiff's third level appeal noted that plaintiff's

27   second level appeal was partially granted "in that an inquiry was conducted."  (ECF No. 1 at 21.)

28   Appeals Examiner R. Briggs found that on May 7, 2012, the examiner reviewed the confidential

1    report related to this appeal and determined that staff did violate policy with respect to one or

2    more of the issues raised, and no relief was provided at the third level review.  (ECF No. 1 at 21.)

3         Plaintiff alleges defendant Sweet was deliberately indifferent to plaintiff's personal safety

4    subjecting plaintiff to cruel and unusual punishment in violation of the Eighth Amendment.  (ECF

5    1 at 8.)  Plaintiff seeks monetary damages, as well as injunctive relief.

6    Defendant's Motion for Summary Judgment

7         Defendant moves for summary judgment on the grounds that it is undisputed that

8    defendant Sweet did not leave another inmate's handcuffs undone so that the inmate could attack

9    plaintiff, and that defendant is entitled to qualified immunity.

10        A.  Legal Standard for Summary Judgment

11        Summary judgment is appropriate when it is demonstrated that the standard set forth in

12   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

13   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

14   judgment as a matter of law."  Fed. R. Civ. P. 56(a).[2]

15
16           Under summary judgment practice, the moving party always
17           bears the initial responsibility of informing the district court of the
             basis for its motion, and identifying those portions of "the
             pleadings, depositions, answers to interrogatories, and admissions
             on file, together with the affidavits, if any," which it believes
             demonstrate the absence of a genuine issue of material fact.
18

19   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

20   56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving party need

21   only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

22   Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

23   387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

24   committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

25   burden of production may rely on a showing that a party who does have the trial burden cannot

26   produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

27   _____
     [2]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.
28   However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he
     standard for granting summary judgment remains unchanged."

should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R.

4

Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at
255.  All reasonable inferences that may be drawn from the facts placed before the court must be
drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences
are not drawn out of the air, and it is the opposing party's obligation to produce a factual
predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.
Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to
demonstrate a genuine issue, the opposing party "must do more than simply show that there is
some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could
not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for
trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on August 30, 2013 (ECF No. 21 at 2), and by
subsequent court order issued October 11, 2013 (ECF No. 24), plaintiff was advised of the
requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil
Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v.
Eikenberry, 849 F.2d 409 (9th Cir. 1988).  On October 11, 2013, plaintiff was granted an
extension of time in which to file an opposition to defendant's motion   (ECF No. 24.)  Plaintiff
did not file an opposition to defendant's motion.

B.  Facts

For purposes of the instant motion for summary judgment, the court finds the following
facts undisputed, unless otherwise noted:[3]

1.  At all relevant times, plaintiff was in the custody of the CDCR at CSP-SAC, and
housed in the Psychiatric Services Unit ("PSU") at CSP-SAC.

2.  From April 12, 2010, through May 9, 2011, defendant Sweet was employed by CDCR
as a day-to-day officer at CSP-SAC, which meant that he was not permanently assigned to a
specific location at the prison.  Instead, the day before his scheduled work day, defendant Sweet

[3]  Despite being provided additional time to oppose defendant's motion for summary judgment
(ECF No. 24), plaintiff did not contest defendant's statement of undisputed facts.  However,
plaintiff's statement of undisputed facts in support of his motion for summary judgment (ECF
No. 16 at 6-7) were incorporated, as appropriate.

5

1    would contact the watch sergeant who would inform defendant Sweet of his work assignment for

2    the upcoming scheduled work day.

3         3.  Defendant Sweet was never permanently assigned to work in any of the four PSU

4    buildings at CSP-SAC.

5         4.  Prior to January 30, 2011, defendant Sweet does not recall meeting, talking to, or

6    having any contact with plaintiff.  Conversely, in his deposition, plaintiff contends defendant

7    Sweet came to plaintiff's cell and called plaintiff a "whistle blower," that Sweet "got news from

8    the other inmates on the block that they don't like whistle blowers," and mentioned, "Yeah, you a

9    whistle blower, and you think that anytime an officer does something wrong that you can just

10   sue."  (Pl.'s Depo. at 17-18, 20, 23.)

11        5.  Defendant Sweet has never entered or searched plaintiff's cell in an unofficial capacity.

12        6.  Defendant Sweet does not recall searching plaintiff's cell in an official capacity,

13   meaning a search mandated by CDCR procedure which requires every floor officer to search

14   three cells a day in each housing unit.

15        7.  If defendant Sweet searched a cell, he is required to leave a cell search receipt, whether

16   or not any property is removed or confiscated.

17        8.  Defendant Sweet does not have, nor does he recall completing, a cell search receipt for

18   plaintiff's cell.

19        9.  Plaintiff does not know if defendant Sweet ever searched his cell and he does not have

20   any witnesses who claim defendant Sweet went into plaintiff's cell.  (Pl.'s Depo. at 20-21.)

21        10.  On January 29, 2011, defendant Sweet called the watch sergeant, and was informed

22   that on January 30, 2011, defendant Sweet would be assigned to work as a floor officer in PSU,

23   Building A-4, which is one of the four assigned PSU Buildings at CSP-SAC.

24        11.  Because he was not permanently assigned to work in the PSU, defendant Sweet was

25   not familiar with any of the inmates housed in PSU, Building A-4.

26        12.  On January 30, 2011, Officer Hanna was on duty as a floor officer at CSP-SAC,

27   working in the PSU.

28   ////

13.  As a floor officer, one of the duties included transporting the PSU inmates to the exercise modules for outdoor exercise.

14.  On January 30, 2011, defendant Sweet and Officer Hanna, along with other officers, whose names they do not recall, transported PSU inmates, including plaintiff, on a golf cart to the exercise modules, which are stand-alone yards, for the inmates to engage in outdoor exercise.

15.  CSP-SAC authorizes the movement of inmates in golf carts so long as the inmates are restrained with handcuffs and leg restraints, if required, based on the inmate's custody level.

16.  After the inmates completed their allotted time in the exercise module, plaintiff was removed from the exercise module and placed in the second row of seats, behind the front seat passenger.  Defendant Sweet and plaintiff do not recall who removed plaintiff from the exercise module and placed him in the golf cart, but it is undisputed that plaintiff was removed, secured and placed in the golf cart behind the front seat passenger.  (Sweet Decl. ¶ 16; Pl.'s Depo. at 26; 28.)

17.  Upon completion of the allotted outdoor exercise time, Officer Hanna assisted in securing other inmates on the golf cart for transport back to the PSU housing unit.

18.  Defendant Sweet removed inmate Valenzuela from the exercise module, searched him according to policy and procedure, placed him in handcuffs and double-locked the handcuffs, placed leg restraints on Valenzuela, and then walked Valenzuela to the golf cart, where defendant Sweet placed Valenzuela in the third row of seats.

19.  Plaintiff saw inmate Valenzuela walk up to the golf cart, and noted that Valenzuela's hands were behind his back like everyone else, and saw that Valenzuela legs were shackled. (Pl.'s Depo. at 28-29.)  Plaintiff testified that inmate Valenzuela sat behind plaintiff, at which point Valenzuela's hands were still behind him.  (Pl.'s Depo. at 29.)

20.  When defendant Sweet places an inmate in restraints, he always double-locks the handcuffs according to CDCR policy and procedure where Sweet secures the handcuffs until he can fit his small finger in between the inmate's wrist and handcuff.  The handcuff is then double-locked, which means the handcuffs are locked again and a key is required to unlock the handcuffs.  To unlock a set of double-locked cuffs, an officer inserts the key into the keyhole and

7

1   turns it in the opposite direction that opens the cuffs.  This releases the double lock.  Turning the

2   key back in the other direction will open the locking mechanism.

3       21.   Using double-locking handcuffs is important when securing a prisoner as it makes it

4   more difficult to pick the locking mechanism and therefore is the most secure way to transport

5   inmates.

6       22.   Defendant Sweet did not know inmate Valenzuela's history or his transport

7   restrictions, if any, because Sweet did not regularly work in the PSU.  Therefore, defendant Sweet

8   followed CDCR's policy and procedure for transporting all inmates, which included applying

9   double-locked handcuffs and leg restraints.

10      23.   The three other officers involved in the transport secured the remaining inmates for

11  transport from the exercise modules back to their housing unit in the PSU.

12      24.   After all the inmates were secured in the golf cart, defendant Sweet sat in the driver's

13  seat, and Officer Hanna sat in the front passenger seat next to defendant Sweet, who was driving

14  the golf cart.

15      25.   Seated behind the first row, in the second row of the golf cart, were plaintiff and

16  another inmate.

17      26.   Seated behind the second row, in the third row of the golf cart, was inmate

18  Valenzuela and another inmate.

19      27.   Seated on the last row, facing outwards, were another officer and another inmate.

20      28.   Defendant Sweet began driving the golf cart back to the PSU housing unit, and as he

21  was driving, defendant Sweet heard something behind him.

22      29.   Officer Hanna also heard inmate movement behind him.

23      30.   Officer Hanna and defendant Sweet turned around and observed inmate Valenzuela

24  strike plaintiff in the face.

25      31.   Defendant Sweet immediately stopped the golf cart and ran around the front of the

26  golf cart.

27  ////

28  ////

8

32. When defendant Sweet stopped the cart, Officer Hanna jumped out of the cart.[4]

33. Officer Hanna saw that the handcuff on Valenzuela was double-locked.[5]

34. Officer Hanna declared that inmate Valenzuela's handcuff was not left uncuffed or loose, and it appeared that Valenzuela managed to slip his right wrist through the handcuff. (Hanna Decl. ¶ 13.)

35. Officer Hanna and defendant Sweet lifted inmate Valenzuela back to his feet and escorted him back to a holding cell in the PSU unit.

36. Upon return to the housing unit, defendant Sweet immediately notified Sgt. Jennings, the sergeant on duty, about the incident.

37. About thirty minutes later, defendant Sweet and Sgt. Jennings escorted plaintiff for medical evaluation.

38. Plaintiff declares that inmate Valenzuela called plaintiff "a damn whistle blower, so you want to be a fucking whistle blower, I hate fucking whistle blower!" during the attack on plaintiff. (ECF No. 16 at 7.) Officer Hanna and defendant Sweet declare that they did not hear inmate Valenzuela say anything before, during or after his attack on plaintiff. (Hanna Decl., ¶ 15; Sweet Decl., ¶ 35.)

39. During the attack, Officer Hanna heard smacking-type sounds, indicating someone was being hit, which alerted him to turn around.

////

---

[4] In his deposition, plaintiff testified that defendant Sweet "snatched Valenzuela out of the van." (Pl.'s Depo. at 30.) Officer Hanna declared that he grabbed Valenzuela and removed him from the van and lowered him to the ground, and defendant Sweet declared that he observed inmate Valenzuela on the ground, and saw Officer Hanna replace the handcuffs on Valenzuela. It is undisputed, however, that a correctional officer quickly intervened to prevent Valenzuela from further attacking plaintiff.

[5] Plaintiff testified that after the attack defendant Sweet "put a set of cuffs on [inmate Valenzuela]," and the other offices were "standing around." (Pl.'s Depo. at 30.) However, Officer Hanna declared that he rolled Valenzuela over to his stomach, and had to use his key to unlock the handcuff in order to replace it back on Valenzuela's right wrist.. Defendant Sweet declared that he observed inmate Valenzuela on the ground and observed Officer Hanna place inmate Valenzuela's right hand back into the handcuff, double-locking it. Regardless of who handcuffed Valenzuela after his attack on plaintiff, it is undisputed that immediately after the attack, defendant Sweet stopped the cart and assisted in securing Valenzuela to prevent further attack.

40.  Officer Hanna declared that in his experience as a correctional officer with the CDCR, he has learned of, and witnessed, several instances where an inmate is able to slip off a double-locked handcuff.  (Hanna Decl., ¶ 16.)  "Inmates are able to slip through the double-locked handcuffs due to small stature, flexible joints or practice in maneuvering their wrists to be in such a position that they are able to sip off the handcuffs."  (Hanna Decl., ¶ 16.)

41. Plaintiff was taken to an outside hospital for treatment on January 30, 2011, the day of the attack, and plaintiff was discharged to CSP-SAC on January 31, 2011.

42.  On February 1, 2011, plaintiff was temporarily rehoused in the Outpatient Housing Unit ("OHU").

43.  On March 11, 2011, plaintiff was moved from the OHU back to the Main Unit, and on March 29, 2011, plaintiff was returned to the PSU.[6]

44.  Officer J. McCartney has been a correctional officer at CSP-SAC since 2002.

45.  Officer J. McCartney does not recall Officer J. Sweet, who either works or worked at CSP-SAC.

46.  Plaintiff claims he spoke to an Officer J. McCartney while plaintiff was housed in the OHU.  Officer McCartney recalls plaintiff, but does not recall any specific conversations or interactions with plaintiff.

47.  Plaintiff claims Officer J. McCartney made specific statements to plaintiff, each of which Officer McCartney denies.[7]

_____

[6]  Defendant's request that the court take judicial notice of plaintiff's movement history, certified by the CDCR Custodian of Records, is granted.  (ECF No. 22.)

[7]  In his declaration submitted in support of his motion for summary judgment, plaintiff declares that Officer McCartney told plaintiff that "inmate Valenzuela was not supposed to be on group escort due to his prior combative behavior towards other inmates."  (ECF No. 16 at 3.)  In his deposition, plaintiff claims that he had the following conversation with Officer J. McCartney:

McCartney:  "Hey, where you been?"

Plaintiff told McCartney plaintiff had been in the OHU.

McCartney:  "Man, that's kind of messed up, what Sweet did.  Run around the block talking about it, man.  And that dude, he's [not] supposed to be on group escort, and he knew."

Plaintiff:  "Can I quote you on that?"

1      48.  Officer McCartney never wrote any reports regarding Officer Sweet.  (McCartney

2   Decl., ¶ 9.)

3      49.  Officer McCartney has never spoken to any inmate about any correctional staff

4   including J. Sweet.  (McCartney Decl., ¶ 10.)

5      50.  In his deposition, plaintiff claims that soon after he spoke with Officer McCartney

6   and learned about Sweet's involvement in the attack, plaintiff submitted a grievance regarding

7   Officer Sweet, which was submitted on August 14, 2011.[8]  (Pl.'s Depo. at 40.)

8      C.  Eighth Amendment Claim

9      The court turns now to plaintiff's claim that defendant Sweet failed to protect plaintiff

10   from harm in violation of the Eighth Amendment.

11      i.  Standards

12      The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S.

13   Const. amend. VIII.  The "unnecessary and wanton infliction of pain" constitutes cruel and

14   unusual punishment prohibited by the United States Constitution.  Whitley v. Albers, 475 U.S.

15   312, 319 (1986).  See also Ingraham v. Wright, 430 U.S. 651, 670 (1977).  Neither accident nor

16   negligence constitutes cruel and unusual punishment, as "[i]t is obduracy and wantonness, not

17   inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and

18   Unusual Punishments Clause."  Whitley, 475 U.S. at 319.

19   _____

20      McCartney:  "Yeah, tell him I told you.  If I need to write a report, I'll write a report."

21   (Pl.'s Depo. at 36.)  Officer McCartney denies telling plaintiff any such statements, and does not
     recall writing any reports pertaining to plaintiff.  (McCartney Decl., ¶¶ 4-8.)  Defendants object to
     plaintiff's deposition testimony concerning McCartney's statements as inadmissible hearsay.

22   Defendants are correct and the objection is sustained.  McCartney's alleged statements to plaintiff
     are inadmissible hearsay and cannot be used to create a dispute of fact.  Fed. R. Civ. P. 56(c);

23   Stillwell v. RadioShack Corp., 676 F.Supp.2d 962, 979 (S.D. Cal. 2009) (hearsay statements do
     not meet plaintiff's burden of producing admissible evidence that creates a dispute of material

24   fact.)

25   [8]   In the grievance submitted August 14, 2011, plaintiff wrote, in pertinent part:

26      Four days ago (approximately 8-10-11), I was told by C/O McCartney that:  (1) the
        inmate (Valenzuela #K-87276) who assaulted me was on single escort status. (2)

27      was not supposed to be on group escort due to his prior assaults on other inmates. . . .

28   (ECF No. 16 at 36.)

11

1    What is needed to show unnecessary and wanton infliction of pain "varies according to

2 the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992)

3 (citing Whitley, 475 U.S. at 320).  It is well established that "prison officials have a duty ... to

4 protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S.

5 825, 833 (1994).  "Being violently assaulted in prison is simply not 'part of the penalty that

6 criminal offenders pay for their offense against society.'"  Id. at 834.  However, prison officials

7 do not incur constitutional liability for every injury suffered by a prisoner at the hands of another

8 prisoner.  Id.

9    To prevail on such a claim the plaintiff must show that objectively he suffered a

10 "sufficiently serious" deprivation.  Farmer, 511 U.S. at 834; Wilson v. Seiter, 501 U.S. 294, 298–

11 99 (1991).  The plaintiff must also show that subjectively each defendant had a culpable state of

12 mind in allowing or causing the plaintiff's deprivation to occur.  Farmer, 511 U.S. at 834.  In this

13 regard, a prison official violates the Eighth Amendment "only if he knows that inmates face a

14 substantial risk of serious harm and disregards that risk by failing to take reasonable measures to

15 abate it."  Id. at 847.  Under this standard, a prison official must have a "sufficiently culpable

16 state of mind," one of deliberate indifference to the inmate's health or safety.  Id.

17           ii.  Analysis

18    It is undisputed that plaintiff was assaulted by inmate Valenzuela.  However, for purposes

19 of the Eighth Amendment, defendant Sweet must have known, or been aware of facts from which

20 such an inference could be drawn, that there was a substantial risk that Valenzuela would assault

21 plaintiff during the group escort.  For the reasons that follow, there is no genuine dispute of

22 material fact on this issue.

23    Defendant Sweet declared that on January 30, 2011, he searched inmate Valenzuela,

24 placed him in handcuffs, double-locked the handcuffs, and placed leg restraints on him.  In

25 addition, Officer Hanna declared that after the attack, he saw that the handcuff on Valenzuela was

26 double-locked.  In his deposition, plaintiff confirmed that inmate Valenzuela's hands were behind

27 him as he approached the golf cart in leg irons, and that when Valenzuela sat down, his hands

28 remained behind him.  Thus, plaintiff concedes that he did not see inmate Valenzuela's hands

12

prior to his placement on the golf cart, and plaintiff submitted no declarations from other witnesses confirming that inmate Valenzuela's hands were not handcuffed prior to his placement on the cart. Therefore, plaintiff failed to rebut defendant's evidence that inmate Valenzuela's hands were handcuffed and double-locked when he was placed on the cart. Because plaintiff could not see inmate Valenzuela's hands, plaintiff has no personal knowledge as to whether or not inmate Valenzuela's hands were handcuffed, and the court declines to accept as true plaintiff's declaration that defendant Sweet left inmate Valenzuela's handcuffs "undone."

Importantly, defendant Sweet adduced evidence that he did not know inmate Valenzuela's history or his transport restrictions, if any, and therefore transported inmate Valenzuela pursuant to prison policy and procedure by transporting Valenzuela in double-locked handcuffs and leg restraints. Defendant Sweet also declared that he did not intend for plaintiff to be attacked or harmed by inmate Valenzuela or any other inmate or staff member. (Sweet Decl., ¶ 36-37.) Plaintiff submitted no competent evidence to rebut defendant Sweet's evidence.

Plaintiff claims that due to a combative history, inmate Valenzuela was not to be escorted in a group escort. However, plaintiff does not declare that he was personally aware of inmate Valenzuela's alleged history. Rather, plaintiff claims he was verbally told such information by Officer McCartney after the attack. But plaintiff did not provide a declaration from Officer McCartney confirming the alleged history or movement restriction. Moreover, plaintiff produced no documentary evidence demonstrating that inmate Valenzuela was restricted from group escort. Thus, plaintiff failed to submit probative evidence to support his claim that inmate Valenzuela had a combative history or that Valenzuela was restricted from group escort.

Moreover, even if inmate Valenzuela was not to be escorted in a group escort, plaintiff adduced no competent evidence demonstrating that defendant Sweet was aware of such a restriction, if any. It is undisputed that defendant Sweet did not become aware of his January 30, 2011 PSU work assignment until the day before, and that because he was not permanently assigned to the PSU, he was not familiar with any of the inmates housed in PSU, Building A-4. Plaintiff presented no evidence demonstrating defendant Sweet was aware of any such restriction, or refuting defendant's declaration that he transported inmate Valenzuela pursuant to prison

1  policy and procedure.  Thus, plaintiff presented no competent evidence showing that defendant

2  Sweet was aware of a substantial risk posed by transporting inmate Valenzuela in a group escort.

3  In addition, plaintiff submitted no evidence demonstrating a connection between defendant and

4  inmate Valenzuela.

5          Because plaintiff failed to submit probative evidence that defendant Sweet failed to

6  handcuff inmate Valenzuela, and that defendant Sweet was aware that inmate Valenzuela posed a

7  substantial risk to plaintiff's safety, defendant Sweet is entitled to summary judgment.  Therefore,

8  the court need not address plaintiff's attempts to assign an ulterior motive to defendant Sweet's

9  alleged placement of inmate Valenzuela on the cart without handcuffs because plaintiff failed to

10  demonstrate that inmate Valenzuela was placed on the cart without handcuffs.  In any event, as

11  argued by defendant, plaintiff failed to submit competent evidence to support his theory that

12  defendant Sweet set plaintiff up for the attack because he allegedly did not like that plaintiff had

13  sued CSP-SAC staff members.  Despite receiving the notice under Rand, as well as an extension

14  of time to oppose defendant's motion, the only evidence submitted by plaintiff in support of his

15  claims, aside from his own declaration, are copies of his administrative appeals and decisions

16  (ECF No. 16 at 36-45), and medical records (ECF No. 16 at 23-34).[9]  Plaintiff did not submit a

17  copy of the incident report from the January 30, 2011 attack, or any witness declarations or other

18  documentary evidence in support of his claims.

19          Finally, plaintiff contends that during the administrative appeal process it was determined

20  that staff violated policy, therefore plaintiff argues that this third level appeal decision[10]

[9]  Interdisciplinary progress notes for February 8, 2011, and February 15, 2011, state that:  "On Sunday 1/30/11, another IP slipped his cuffs and assaulted IP Garrett - resulting in a broken jaw." (ECF No. 16 at 32, 33.)  Such information is not specifically attributed to plaintiff or to Dr. Brizendine, the staff psychologist who authored the reports.

[10]  Defendant's objections to this court's review of plaintiff's exhibits are overruled for purposes of summary judgment; this court offers no opinion on the admissibility of these documents at trial.  On summary judgment, there is no apparent reason for questioning the authenticity of these formal administrative documents and medical records.  Documents not authenticated at summary judgment may nonetheless be admissible at trial.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); see also Aholelei v. Hawaii Dept. of Public Safety, 220 Fed. Appx. 670 (9th Cir. 2007) (abuse of discretion to refuse to consider prisoner's evidence in opposition to summary

14

1   demonstrates that defendant Sweet violated policy.  However, plaintiff adduced no evidence

2   demonstrating that defendant Sweet was the "staff" referred to in the administrative appeal

3   process.  Moreover, plaintiff produced no evidence showing what "policy" was violated.  The

4   third level decision states that "[o]n May 7, 2012, the examiner reviewed the confidential report

5   related to this appeal and determined that staff did violate policy with respect to one or more of

6   the issues raised."  (ECF No. 16 at 44.)  Plaintiff did not provide a copy of the confidential report,

7   or a declaration from the examiner attesting to the contents of such a report, or evidence

8   identifying what issues the decision cited.  Plaintiff's self-serving statements, absent personal

9   knowledge, are insufficient.  Therefore, such administrative finding, without more, cannot serve

10  to demonstrate that defendant Sweet violated policy on January 30, 2011.

11          Based on the above, the undersigned recommends that defendant's motion for summary

12  judgment be granted, and plaintiff's motion for summary judgment be denied.

13          D.  <u>Alternative Grounds</u>

14          Because defendant is entitled to summary judgment, the court need not address

15  defendant's argument that he is entitled to qualified immunity.

16  <u>Conclusion</u>

17          Accordingly, IT IS HEREBY ORDERED that defendant's request for judicial notice

18  (ECF No. 22) is granted; and

19          IT IS RECOMMENDED that:

20          1.  Defendant's motion for summary judgment (ECF No. 21) be granted; and

21          2.  Plaintiff's motion for summary judgment (ECF No. 20) be denied.

22          These findings and recommendations are submitted to the United States District Judge

23  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

24  after being served with these findings and recommendations, any party may file written

25  objections with the court and serve a copy on all parties.  Such a document should be captioned

26  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

27

28  judgment because it was inadmissible form).

1    objections shall be served and filed within fourteen days after service of the objections.  The

2    parties are advised that failure to file objections within the specified time may waive the right to

3    appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

4    Dated:  January 22, 2014

5

6    /garr2917.msj

                                        KENDALL J. NEWMAN
                                        UNITED STATES MAGISTRATE JUDGE

16